UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

NICHOLAS PAPANTONIOU,                    :
    Plaintiff,                          :
                                     :
    v.                                  :     Case No. 3:19cv1996(KAD)
                                       :
ANGEL QUIROS, DISTRICT                   :
ADMINISTRATOR, ET AL.,                   :
    Defendants.                         :

## **INITIAL REVIEW ORDER**

Plaintiff, Nicholas Papantoniou ("Papantoniou"), a sentenced inmate currently incarcerated in the MacDougall Building at the MacDougall-Walker Robinson Correctional Institution ("MacDougall"), brings this civil rights action pursuant to 42 U.S.C. § 1983 against District Administrator Angel Quiros, Warden William Mulligan, Health Services Administrator R. Lightner, Lieutenant Jasmin, Correctional Officers Russell and Musshorn, Disciplinary Hearing Officers Lieutenants Rivera and Prior, Officer/Investigators Gonzalez and Mathews, Medical Staff Member Kevin McKrystal, Dr. Sayed J. Naqvi and Nurse Tawana Furtick.[1] Papantoniou asserts claims of deliberate indifference to medical needs,  a denial of procedural due process and unconstitutional conditions of confinement.  For the reasons set forth below, the court severs and/or dismisses all claims except for the Eighth Amendment deliberate indifference to medical needs claim against Defendants Lightner, Russell, Jasmin, Naqvi and McCrystal.

---

[1]  The only defendants listed in the caption on the first page of the complaint are District Administrator Quiros, Warden Mulligan, Health Services Administrator Lightner and Lieutenant Jasmin. Federal Rule of Civil Procedure 10(a) provides that "[e]very pleading must have a caption" and that the "title of the complaint must name all parties."  The Second Circuit, however, "excuse[s] technical pleading irregularities as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party."  *Shariff v. United States*, 689 F. App'x 18, 19 (2d Cir. 2017) (summary order) (quoting *Phillips v. Girdich*, 408 F.3d 123, 128 (2d Cir. 2005)).  Because the unnamed defendants are included in the description of parties, the Court concludes that Papantoniou intended to name these individuals as defendants and considers them to be defendants.

**Standard of Review**

Pursuant to 28 U.S.C. § 1915A(b), the court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.* In undertaking this review, the court is obligated to "construe" complaints "liberally and interpret[] [them] to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks and citation omitted).

Although detailed allegations are not required under Rule 8(a) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

**Allegations**

On September 19, 2016, Papantoniou was sitting at a desk in his cell at MacDougall when he experienced a severe spasm in his back. *See* Compl., ECF No. 1, at 10. The spasm started on the right side of his lower back and shot up his right side and then down his right leg. *Id.* Medical staff members transported Papantoniou to the medical department in a wheelchair.

2

*Id.* Because there was no physician at MacDougall that day, the nurse contacted an off-site physician who prescribed an injection of Toradol and a muscle relaxant. *Id.* at 10-11. After returning to his cell, Papantoniou fell asleep. *Id.* at 11. The next morning, Papantoniou experienced severe pain in his back. *Id.* Someone from the medical department informed Papantoniou that he should stay in bed and rest his back for two weeks. *Id.* Papantoniou's cellmate retrieved meals for him and assisted him to the toilet. *Id.*

After two weeks, the pain was less intense, and the spasms occurred less frequently but Papantoniou still experienced pain every day and the spasms often incapacitated him. *Id.* Papantoniou sent requests for medical treatment to Medical Provider McKrystal, but McKrystal did not respond. *Id.* A correctional officer suggested that Papantoniou submit a request to be placed on the sick call list. *Id.* at 12.

In July 2017, Papantoniou underwent x-rays of his spine, but no one discussed the results with him. *Id.* A nurse prescribed Papantoniou 600 milligrams of Motrin to be taken every morning and evening to alleviate his back pain and spasms. *Id.* On August 28, 2017, in an inmate request addressed to the medical department, Papantoniou informed Nurse Furick that Motrin should be taken with food because ingesting Motrin on an empty stomach could cause further medical problems. *Id.* at 13. In addition, Papantoniou made Furtick aware that that Motrin was not effective in alleviating his painful back spasms. *Id.* A medical provider subsequently discontinued Papantoniou's prescription for Motrin without warning and without providing Papantoniou any alternative treatment for his back pain. *Id.* At one point, Papantoniou wrote to Health Services Administrator Lightner seeking medical treatment and an explanation of his x-ray results. *Id.* A nurse subsequently informed Papantoniou that the x-rays revealed

evidence of spinal deterioration.  *Id.*

Papantoniou submitted multiple requests to be seen for treatment of his back spasms.  *Id.*
On October 10, 2017, Medical Staff Member McKrystal met with Papantoniou and prescribed a
muscle relaxant.  *Id.*  McKrystal explained that he had prescribed the muscle relaxant for a year
and that it would be available to Papantoniou as needed.  *Id.* at 14.  On or about November 15,
2017, Papantoniou went to the pharmacy in the medical department and asked for the muscle
relaxant.  *Id.*  Nurse Furtick informed Papantoniou that she could only dispense the muscle
relaxant every three months.  *Id.*  When Papantoniou returned for the muscle relaxant three
months later, a nurse at the pharmacy refused to provide it to him and informed him that a
medical provider had discontinued the prescription.  *Id.*

On January 11, 2018, a staff member called Papantoniou to the medical department for a
sick call appointment.  *Id.*  Papantoniou refused to be seen by a nurse.  *Id.*  On March 28, 2018,
Medical Staff Member McKrystal recommended that Papantoniou undergo steroid injections in
his back.  *Id.*  A nurse sent a request to the Utilization Review Committee ("URC") for approval
of the steroid injections.  *Id.*; Ex. L.  Papantoniou never received a steroid injection in his back.
*Id.* at 15.

On April 17, 2018, as Papantoniou climbed down from the bunk in his cell, he
experienced a back spasm that caused him to lose his footing and fall to the floor.  *Id.*
Papantoniou's cellmate pressed the buzzer in the cell to summon assistance.  *Id.*  Correctional
Officer Russell informed Papantoniou and his cellmate that no one would be coming from the
medical department and that it was not an emergency.  *Id.*  Officer Russell later toured the
housing unit and observed Papantoniou on the floor of his cell, listened to his request for medical

assistance, but declined to summon someone from the medical unit.  *Id.*

Approximately one hour later, officers opened the cell doors in Papantoniou's housing unit to permit inmates to go to recreation.  *Id.* at 16.  Papantoniou's cellmate helped him down the stairs to the lower tier to speak to Officer Russell at the officers' station.  *Id.*  Papantoniou sat on the floor next to the officer's station and asked Officer Russell to call a captain or a lieutenant, but Officer Russell refused to do so.  *Id.*

Papantoniou got the attention of another inmate and stated that he needed to speak to a lieutenant or a captain.  *Id.*  Upon arrival in the housing unit, Lieutenant Jasmin spoke to Papantoniou but did not believe Papantoniou's claims about his back spasms and refused to call the medical department.  *Id.* at 16-17.  Lieutenant Jasmin ordered Papantoniou to remain where he was and ordered the other inmates in the housing unit to return to their cells.  *Id.* at 17.  At the direction of Lieutenant Jasmin, correctional officers pulled Papantoniou to a standing position, applied handcuffs to his wrists, placed him in a wheelchair and transported him to the restrictive housing unit.  *Id.*  After placing Papantoniou in a cell, the officers informed him that he would be receiving a Class A disciplinary report.  *Id.* at 18.

The cell was a "dry cell" meaning that the toilet could only be flushed and the water in the sink could only be turned on by a prison officer or official from outside the cell.  *Id.*  A nurse came to ask Papantoniou questions but none of the questions pertained to his back injury.  *Id.*

Papantoniou remained in the cell in only his boxer shorts without a blanket, soap or toothbrush for over a week.  *Id.* at 18-19.  Papantoniou did not receive toilet paper until the second day that he was confined in the restrictive housing unit.  *Id.* at 21.  He was forced to rip pages out of a book to use in place of toilet paper.  *Id.*  The overhead light in the cell was on all

day and night and the cell was cold. *Id.* at 18-19. Papantoniou lay on the bunk most of the time

due to the pain in his back and was unable to ask an officer to flush the toilet in his cell for

several days. *Id.* at 19-20.

At one point, Papantoniou moved himself over to the door and asked Correctional Officer

Musshorn, who worked during the first shift each day, to flush the toilet. *Id.* at 19. Officer

Musshorn refused to do so. *Id.* An officer working on the second shift each day did flush the

toilet when Papantoniou asked him to do so. *Id.* No officer ever brought Papantoniou soap or a

toothbrush and he was unable to wash his hands after using the toilet. *Id.* at 19, 21.

If Papantoniou was not at the door to receive his meals, Officer Musshorn considered

Papantoniou to have refused the meal. *Id.* at 22. Officer Musshorn did not believe that

Papantoniou was injured. *Id.* On several days, Papantoniou missed both meals. *Id.* He lost at

least fourteen pounds during his confinement in the restrictive housing unit. *Id.*

After receiving a piece of paper and a pen from a correctional officer, Papantoniou

submitted a request to be seen by someone in the medical department. *Id.* at 23. On April 25,

2018, officers forced Papantoniou to walk to the medical department rather than transporting him

in a wheelchair. *Id.* A nurse took Papantoniou's vital signs, weighed him, dispensed two 200

milligram tablets of Motrin to him and informed an officer that Papantoniou should be offered

the same dosage of Motrin each day for the next several days. *Id.* Papantoniou did not receive

any medication during the rest of his stay in the restrictive housing unit. *Id.*

On approximately the tenth day of his confinement in the restrictive housing unit, officers

moved Papantoniou to a new cell with a cellmate. *Id.* at 24. Papantoniou's cellmate waited by

the door of the cell to accept meals and toiletries and assisted Papantoniou in getting dressed. *Id.*

Papantoniou was forced to wear the same clothes for ten days.  *Id.*

At some point, Disciplinary Investigators Gonzalez and Matthews arrived at Papantoniou's cell and asked whether he was going to plead guilty to the disciplinary report.  *Id.* Papantoniou stated that he did not know what he had been charged with and that he needed medical treatment.  *Id.*  Investigator Gonzalez indicated that he would put Papantoniou down for a hearing and left.  *Id.*

On May 1, 2018, prison officials released Papantoniou from the restrictive housing unit and placed him in a cell in the "ticket block."  *Id.* at 25.  Papantoniou began to file requests for medical treatment.  *Id.*  Papantoniou met with Counselor Reeves, who had been assigned as his advocate for the disciplinary hearing, to discuss the April 17, 2018 incident that led to the issuance of the disciplinary report for interfering with safety and security.  *Id.*  Counselor Reeves informed Papantoniou that she had viewed the videotape of the incident, it was favorable to him and that four inmates had delivered witness statements to her regarding the incident.  *Id.* at 26.

On May 16, 2018, Investigators Gonzalez and Matthews informed Papantoniou that the hearing would be held the next day.  *Id.*  On May 17, 2018, Papantoniou was present at the hearing and was prepared to speak on his own behalf.  *Id.*  Counselor Reeves was not present. *Id.*  The hearing lasted only a few minutes.  *Id.* at 27.  The disciplinary hearing officer informed Papantoniou that it was unnecessary to look at the videotape or any witness statements because the officers' accounts of the incident were sufficient.  *Id.*

The disciplinary hearing officer found Papantoniou guilty of the charge of interfering with security and imposed sanctions of fifteen days of punitive segregation, thirty days loss of recreation, ninety days loss of phone privileges and fifteen days forfeiture of Risk Reduction

Earned Credit.  *Id.* at 28.  Papantoniou did not receive a statement of the evidence that the
disciplinary hearing officer relied on to support the guilty finding.  *Id.* at 27.  Papantoniou claims
that his placement in the "ticket block" for 120 days after his release from the restrictive housing
unit constituted an additional sanction and that he also lost contact visits for an undetermined
period of time.  *Id.* at 28.

Papantoniou appealed the disciplinary decision.  *Id.*  On June 5, 2018, District
Administrator Quiros denied the appeal.  *Id.* at 29.  Papantoniou wrote to Warden Mulligan about
his "excessive sanctions," but Warden Mulligan did not respond to the letter.  *Id.*

After spending 120 days in the "ticket block," officials released Papantoniou to general
population.  *Id.*  Papantoniou learned that he had lost his job as a result of the disciplinary report.
*Id.*

Papantoniou submitted requests for medical treatment for his back spasms and a letter to
Health Services Administrator Lightner.  *Id.* at 30.  On December 6, 2018, Dr. Naqvi met with
Papantoniou, asked him questions about his injury and symptoms and informed Papantoniou that
his symptoms were age-related.  *Id.*  Dr. Naqvi prescribed acetaminophen and indicated that he
would submit a request to the URC seeking approval for Papantoniou to undergo an MRI.  *Id.*
Dr. Naqvi was not confident that the request would be granted.  *Id.*

In March 2019, Papantoniou met with APRN McPherson who determined that medical
history and symptoms required that he undergo an MRI.  *Id.* at 31.  McPherson scheduled an
MRI and informed Papantoniou that a medical provider had prescribed a lidocaine patch for his
back in December 2018.  *Id.*  At the direction of the APRN McPherson, Papantoniou went to the
medical department to receive the lidocaine patch.  Nurse Furtick and another nurse refused to

provide Papantoniou with the patch.  *Id.*

Papantoniou continued to inquire about the MRI and requested the lidocaine patch.  *Id.*
At some point, he did start to receive the lidocaine patch, but it was not always provided to him
daily as prescribed.  *Id.* at 32.

In April 2019, officials transported Papantoniou to the University of Connecticut Health
Center ("UCONN") to undergo an MRI of his back.  *Id.*  After undergoing the MRI, a nurse at
UCONN informed Papantoniou that a medical provider at MacDougall would review the results
with him the following day.  *Id.*  Papantoniou waited several days but no one reviewed the
results of the MRI with him.  *Id* at 33.  He filed a grievance.  *Id.*  On June 3, 2019, he sent a
request to check on the status of the grievance.  *Id.*  On July 11, 2019, Papantoniou filed another
grievance.  On July 20, 2019, he received a response indicating that he had been put on the
provider list to be been seen in four to six weeks.  *Id.*

On July 24, 2019, APRN McPherson met with Papantoniou to discuss the results of the
MRI.  *Id.* at 34.  The MRI reflected degenerative changes to Papantoniou's lower spine – spinal
stenosis – which was usually treated with oral medication or steroid injections and physical
therapy.  *Id.*  If those forms of treatment were unsuccessful then surgery could be recommended.
*Id.*  The medical department did not schedule any follow-up appointments for Papantoniou with
either a physician or a specialist.  *Id.*

The lidocaine patch numbs the area around the injury to Papantoniou's back but does not
offer any other relief.  *Id.*  There have been days when the medical department has neglected to
provide Papantoniou with the patch.  *Id.* at 35.  As of November 14, 2019, Papantoniou was
working as a plumber in the maintenance department of MacDougall.  Ex. JJ.

**Discussion**

Papantoniou asserts claims of deliberate indifference to a serious medical need in violation of the Eighth Amendment against Health Services Administrator R. Lightner, Medical Staff Member Kevin McKrystal, Dr. Sayed J. Naqvi, Nurse Tawana Furtick, Lieutenant Jasmin and Correctional Officer Russell; a claim of unconstitutional conditions of confinement in violation of the Eighth Amendment against Correctional Officer Musshorn; and a claim of a denial of due process in connection with the issuance of the April 17, 2018 disciplinary report in violation of the Fifth and Fourteenth Amendments against Disciplinary Hearing Officers Lieutenants Rivera and Prior, Officer/Investigators Gonzalez and Mathews, Warden Mulligan and District Administrator Quiros.  Papantoniou seeks compensatory damages, a declaration that the defendants violated his federal constitutional rights and an injunction directing the defendants to: (1) provide him with physical therapy and/or permit his enrollment in the Wellness Program, as an alternative to pain medication; (2) provide him with pain medication and pain management if his condition deteriorates; and (3) prescribe him an orthopedic mattress and pillow, to be replaced as necessary during his remaining years in prison.  *Id.* at 36-37.

**Deliberate Indifference to Medical Needs**

Papantoniou contends that at various times over a three-year period Health Services Administrator R. Lightner, Lieutenant Jasmin, Correctional Officer Russell, Medical Staff Member Kevin McKrystal, Dr. Sayed J. Naqvi and Nurse Tawana Furtick failed to provide him with timely or effective treatment for the injury to his back and the pain associated with the injury.

The Eighth Amendment prohibits "deliberate indifference to an inmate's serious medical needs." *Estelle v Gamble*, 429 U.S. 97, 104 (1976).  An inmate must meet two elements to state a claim that a prison official or medical provider was deliberately indifferent to his medical needs.  An inmate must first allege facts that demonstrate that his medical need or condition is objectively serious.  *Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need contemplates "a condition of urgency" such as "one that may produce death, degeneration, or extreme pain") (internal quotation marks and citation omitted).  In determining whether a condition is serious, the Court considers whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). An inmate must also allege that the official acted with the requisite *mens rea,* that is, that the prison official or medical provider was actually aware that his actions or inactions would create a substantial risk of serious harm to the inmate.  *See Hill*, 657 F.3d at 122 (citation omitted).  Mere negligent conduct, however, does not constitute deliberate indifference.  *See id.* at 123 ("'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'") (quoting *Estelle*, 429 U.S. at 106).  Nor does a difference of opinion between a medical provider and an inmate regarding a diagnosis or appropriate medical treatment.  *Chance*, 143 F.3d at 703.

Given the severe and at times debilitating back spasms and pain that Papantoniou claims to have experienced beginning on September 19, 2016 and continuing thereafter, he has plausibly alleged that he suffered from an objectively serious medical condition or need.

11

Accordingly, the court addresses whether Papantoniou has plausibly alleged that each defendant acted with the requisite *mens rea*.

### Correctional Officer Russell and Lieutenant Jasmin

Papantoniou alleges that on April 17, 2018, he exacerbated the injury to his back when he fell as he climbed down from the bunk in his cell.  His cellmate called Officer Russell to inform him about the incident and Papantoniou's need for medical treatment.  Officer Russell informed Papantoniou and his cellmate that no one from the medical department was coming and that it was not an emergency.  Officer Russell then toured the unit and observed Papantoniou lying on the floor of the cell but ignored his requests for medical assistance.

After arriving in the housing unit, Lieutenant Jasim learned that Papantoniou claimed to be in significant pain but did not believe him. Rather than call medical or allow him to return to his cell, Jasmin ordered officers to transport Papantoniou in a wheelchair directly to the restrictive housing unit due to behavior that Lieutenant Jasmin considered to be disruptive.

Construing the allegations liberally and in Papantoniou's favor, these allegations state a plausible claim for deliberate indifference to a serious medical need by both Russell and Jasmin. *See Vines v. McCrystal*, No. 3:18CV1432(MPS), 2018 WL 6050896, at *4 (D. Conn. Nov. 19, 2018) (concluding inmate's allegations that correctional officers "refused to facilitate treatment of his knee injury by the medical department, despite his complaints of excruciating pain, state a plausible claim of deliberate indifference to a serious medical need.") (citing inter alia, *Laster v. Mancini,* No. 07 Civ. 8265(DAB), 2013 WL 5405468, at *21 (S.D.N.Y. Sept. 25, 2013) ("Courts have declined to dismiss deliberate-indifference claims as a matter of law where plaintiffs have alleged a delay in medical treatment causing substantial pain, even when the injuries alleged

were not life-threatening and the delay was relatively brief.")). The Eighth Amendment deliberate indifference to medical needs claims asserted against Lieutenant Jasmin and Correctional Officer Russell will proceed.

### Health Services Administrator Lightner

Papantoniou alleges that he wrote to Lightner on two occasions thereby making her aware of his situation.  Although Lightner did not personally respond to his requests, Papantoniou notes that following his efforts, a medical provider did review with him the x-rays that had been taken of his back and Papantoniou was scheduled to see Dr. Naqvi in December 2018.  *See* Compl. at 13 ¶ 34; at 30 ¶¶ 103-05; Ex. H.  The Complaint is also replete with allegations regarding the medical unit generally, and the failures by unnamed persons therein to adequately treat or respond to Papantoniou's medical needs.  Because Papantoniou seeks prospective injunctive relief requiring that he receive certain treatment, and because Defendant Lightner, as the Health Services Administrator is, at least for purposes of this review, presumed to be able to direct such treatment, the Eighth Amendment deliberate indifference claim will proceed as to Defendant Lightner.

### Nurse Furtick

On September 4, 2017, Nurse Furtick responded to Papantoniou's request to the medical department in which he stated that taking Motrin in the morning on an empty stomach could cause additional medical problems and that Motrin was not effective in alleviating his back spasms.  Compl., Ex. G.  In response to Papantoniou's request, Nurse Furtick indicated that on September 1, 2017, she had re-prescribed Motrin to be kept on Papantoniou's person meaning that he could take Motrin when he needed it and that she had signed him up to be seen by a

13

medical provider at sick call.  *Id.*  The allegations regarding Nurse Furtick's response to Papantoniou's concerns do not plausibly allege deliberate indifference to his serious medical needs.

The only other allegation asserted against Nurse Furick pertains to her refusal, on one occasion, to provide Papantoniou with a lidocaine patch.  In this regard, Papantoniou attached an inmate request form in which he asserted that the reason Nurse Furtick did not provide him with a lidocaine patch was because the prescription for the patch had expired.  *See* Compl., Ex. BB.  Papantoniou further alleges and the form seems to confirm that he did eventually receive the lidocaine patch.  *Id.* at 32 ¶ 111.  The allegation that Nurse Furtick did not dispense a lidocaine patch to Papantoniou on one occasion does not constitute a plausible claim of deliberate indifference to his serious medical needs.  The Eighth Amendment deliberate indifference to medical needs claims asserted against Nurse Furtick are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### Dr. Naqvi

Papantoniou alleges that Dr. Naqvi examined him on one occasion in December 2018.  Despite making Dr. Naqvi aware of the nature and degree of the chronic pain that he had been experiencing in his back, Dr. Naqvi only prescribed Tylenol.  Dr. Naqvi indicated that he would submit a request to URC seeking approval for an MRI of Papantoniou's back, but that approval of the request could take a long time and that he was not confident that the URC would approve the request at all.  Dr. Naqvi did not prescribe any other treatment to alleviate Papantoniou's painful back spasms or follow-up with Papantoniou in any way.  Papantoniou has plausibly alleged that Dr. Naqvi was deliberately indifferent to his medical needs. Accordingly, the Eighth

Amendment deliberate indifference to medical needs claim will proceed against Dr. Naqvi.

**Medical Staff Member McKrystal**

Staff member McKrystal examined and/or spoke to Papantoniou on at least two occasions. During the first appointment in October 2017, McKrystal prescribed a muscle relaxant. Papantoniou understood that the medication would be available any time that Papantoniou needed it for up to a year. Within a month of taking the medication for the first time however, Papantoniou learned that he could not receive the muscle relaxant more frequently than every three months. He subsequently learned that a medical provider had discontinued the prescription. Although Papantoniou attempted to resolve the matter with McKrystal, it is not clear that McKrystal spoke to or met with Papantoniou or provided an alternative pain medication or treatment to Papantoniou.

At some point prior to March 20, 2018, McKrystal prescribed or recommended that Papantoniou receive steroid injections for his painful back spasms. A nurse subsequently submitted a request to the URC seeking approval of the steroid injections. McKrystal never informed Papantoniou of the URC's decision or otherwise followed up with Papantoniou.

In May 2018, McKrystal became aware that Papantoniou continued to suffer from chronic pain in his back and had not been examined by a physician. He did not schedule Papantoniou to be seen by a physician during sick call until July 20, 2018 and a physician did not examine Papantoniou until December 2018. The court concludes that Papantoniou has plausibly alleged that McKrystal was deliberately indifferent to Papantoniou's medical needs and the Eighth Amendment deliberate indifference to medical needs claims will proceed against Medical Staff Member McKrystal.

**Monetary Damages – Lightner, Naqvi, McKrystal, Jasmin and Russell – Official Capacities**

To the extent that Papantoniou seeks compensatory damages from the defendants in their official capacities, those claims for relief are barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity). The claims seeking monetary damages from Health Services Administrator Lightner, Dr. Naqvi, Medical Staff Member McKrystal, Correctional Officer Russell and Lieutenant Jasmin in their official capacities are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

**Declaratory and Injunctive Relief – Lightner, Naqvi, McKrystal, Jasmin and Russell**

Papantoniou seeks a declaration that the defendants violated his federal constitutional rights. Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000). In determining whether *Ex Parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted).

16

Accordingly, the request that the Court declare that the defendants violated Papantoniou's federal constitutional rights in the past is barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* ... to claims for retrospective relief") (citations omitted). The request for a declaratory judgment against Health Services Administrator Lightner, Dr. Naqvi, Medical Staff Member McKrystal, Correctional Officer Russell and Lieutenant Jasmin is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). The court will permit the requests for prospective injunctive relief pertaining to the claims of deliberate indifference to proceed against Dr. Naqvi, Health Services Administrator Lightner, Medical Staff Member McKrystal, Correctional Officer Russell and Lieutenant Jasmin in their official capacities only.

**Remaining Allegations – Due Process and Conditions of Confinement**

Papantoniou's allegations regarding the issuance of the disciplinary report on April 17, 2018 and the allegations relating to the disciplinary investigation and hearing against Hearing Officers Lieutenants Rivera and Prior, Officer/Investigators Gonzalez and Mathews, Warden Mulligan and District Administrator Quiros form the basis of his procedural due process claim. These allegations are wholly unrelated to the Eighth Amendment claims of deliberate indifference to medical needs discussed above. Similarly, the allegations that Correctional Officer Musshorn subjected Papantoniou to unconstitutional conditions of confinement during his fifteen-day confinement in the restrictive housing unit are factually untethered to the deliberate indifference to medical needs claims.

17

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).  The court approaches the determination of "[w]hat [might] constitute the same transaction or occurrence . . . on a case by case basis."  *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).  In interpreting the terms transaction or occurrence as used in Rule 13(a), Fed. R. Civ. P., the Second Circuit has observed that whether a counterclaim arises out of the same transaction as the original claim depends upon an assessment of "the logical relationship between the claims" and a determination of whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."  *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978) (citations omitted).  The court applies an analogous interpretation to the terms transaction or occurrence as used in Rule 20(a)(2).

Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any claim against a party" pursuant to a motion filed by a party to the action or on its own. Fed. R. Civ. P. 21.  In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: "(1) [do] the claims arise out of the same transaction or occurrence; (2) [do] the claims present some common question of law or fact; (3) [would] settlement of the claims or judicial economy be facilitated; (4) will prejudice [] be avoided; and (5) [will] different

witnesses and documentary proof [be] required for the separate claims." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–66 (D. Conn. 2012) (citation omitted).

Although all of the claims arise within the context of Papantoniou's incarceration, the allegations pertaining to the Fifth and Fourteenth Amendment deprivations of procedural due process and the Eighth Amendment conditions of confinement claim do not arise out of the same transaction or occurrence as the Eighth Amendment deliberate indifference to medical needs claim.  Each claim identifies a distinct group of defendants; each is based on wholly different series of events; and each relies upon a different theory of liability. And only the Eighth Amendment deliberate indifference claim seeks injunctive relief.  Further, to allow all of these disparate claim, to proceed in a single complaint would be both unwieldy and inefficient. Different witnesses/testimony and documentary evidence would be required for each claim, rendering both the discovery process and the trial an unnecessary behemoth. The defendants and the claims are not properly joined in this action and the relevant factors favor severance of these claims. *See Lindsay v. Semple*, No. 3:19-CV-751 (JCH), 2019 WL 3317320, at *10–11 (D. Conn. July 24, 2019) (severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of Fed. R. Civ. P. 20)(citing *Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015) (advising plaintiff that improperly joined claims must be pursued in separate actions)).

Pursuant to Rules 20 and 21, Fed. R. Civ. P., the court severs and dismisses without prejudice the Fifth and Fourteenth Amendment procedural due process claims asserted against Disciplinary Hearing Officers Lieutenants Rivera and Prior, Officer/Investigators Gonzalez and Mathews, Warden Mulligan and District Administrator Quiros and the Eighth Amendment

conditions of confinement claims asserted against Correctional Officer Musshorn. If Papantoniou

wants to pursue these claims, he must do so by filing a separate lawsuit.

**ORDERS**

In accordance with the foregoing analysis, the court enters the following orders:

(1)     The Clerk is directed to first add Medical Staff Member Kevin McKrystal, Dr.

Sayed J. Naqvi, Nurse Tawana Furtick, Correctional Officer Russell, Correctional Officer

Musshorn, Disciplinary Hearing Officer Lieutenant Rivera, Disciplinary Hearing Officer

Lieutenant Prior, Officer/Investigator Gonzalez, Officer/Investigator to the docket as defendants.

The Eighth Amendment deliberate indifference to medical needs claim against Nurse

Furtick is **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1) and the Eighth Amendment

deliberate indifference to medical needs claims seeking money damages and declaratory relief

against Lightner, Dr. Naqvi, Medical Staff Member McKrystal, Correctional Officer Russell and

Lieutenant Jasmin in their official capacities are **DISMISSED** pursuant to 28 U.S.C. §

1915A(b)(1) and (2).

The Fifth and Fourteenth Amendment procedural due process claims asserted against

Disciplinary Hearing Officers Lieutenants Rivera and Prior, Officer/Investigators Gonzalez and

Mathews, Warden Mulligan and District Administrator Quiros and the Eighth Amendment

conditions of confinement claims asserted against Correctional Officer Musshorn are **SEVERED**

and **DISMISSED** without prejudice pursuant to Rules 20 and 21, Fed. R. Civ. P.  Papantoniou

may pursue these claims in a separate lawsuit. The Clerk of the Court is directed to terminate

these defendants.

The Eighth Amendment deliberate indifference to medical needs claims will **PROCEED** against Health Services Administrator Lightner, Dr. Naqvi, Medical Staff Member McKrystal, Correctional Officer Russell and Lieutenant Jasmin in their individual capacities and in their official capacities to the extent that Papantoniou seeks injunctive relief.

(2)     On or before May 8, 2020, the Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshals Service.  The U.S. Marshals Service shall serve the summons, a copy of the Complaint, and a copy of this Order on Administrator Lightner, Dr. Naqvi, Medical Staff Member McKrystal, Correctional Officer Russell and Lieutenant Jasmin in their official capacities by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141.

(3)     On or before May 8, 2020, the Clerk shall verify the current work addresses of: Administrator Lightner, Dr. Sayed J. Naqvi, Medical Staff Member Kevin McKrystal, Correctional Officer Russell and Lieutenant Jasmin with the Department of Correction Office of Legal Affairs and mail a copy of the Complaint, this Order and a waiver of service of process request packet to each of these defendants in his or her individual capacity at the confirmed address.  On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of the request. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service and Officer Leone shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4)     Defendants Lightner, Naqvi, McKrystal, Russell and Jasmin shall file a response to the Complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If they choose to

file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include all additional defenses permitted by the Federal Rules.

(5)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed by **October 17, 2020.** Discovery requests need not be filed with the court.

(6)     All motions for summary judgment shall be filed by **November 17, 2020**.

(7)     The Clerk shall send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

(8)     The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Clerk. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

SO ORDERED at Bridgeport, Connecticut this 17th day of April, 2020.

_____/s/_____
Kari A. Dooley
United States District Judge

22