UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NICHOLAS PAPANTONIOU,               :
    Plaintiff,                  :
                              :
    v.                          :    Case No. 3:19cv1996(KAD)
                              :
ANGEL QUIROS, ET AL.,               :
    Defendants.                 :

**MEMORANDUM OF DECISION RE: MOTION FOR SUMMARY JUDGMENT**

Kari A. Dooley U.S.D.J.

      The plaintiff, Nicholas Papantoniou ("Papantoniou"), a sentenced inmate confined at the

MacDougall-Walker Correctional Institution ("MacDougall-Walker") initiated this civil rights

action against District Administrator Angel Quiros, Warden William Mulligan, Health Services

Administrator Rikel Lightner, Lieutenant Jasmin, Correctional Officers Russell and Musshorn,

Disciplinary Hearing Officers Lieutenants Rivera and Prior, Officers/Investigators Gonzalez and

Mathews, Physician Assistant Kevin McCrystal, Dr. Syed J. Naqvi, and Nurse Tawana Furtick.

Upon initial review, *see* 28 U.S.C. § 1915A(b), the court permitted only an Eighth Amendment

deliberate indifference to medical needs claims to proceed against Dr. Naqvi, PA McCrystal,

Health Services Administrator Lightner, Correctional Officer Russell and Lieutenant Jasmin in

their individual capacities and in their official capacities to the extent that Papantoniou sought

injunctive relief.[1]  ECF No. 7 at 21.

---

[1] The court dismissed the Eighth Amendment deliberate indifference to medical needs claims against Nurse
Furtick pursuant to 28 U.S.C. § 1915(b)(1) and the Eighth Amendment deliberate indifference to medical needs
claims seeking money damages and declaratory relief from Dr. Naqvi, Medical Staff Member McCrystal, Health
Services Administrator Lightner, Correctional Officer Russell and Lieutenant Jasmin in their official capacities pursuant to 28
U.S.C. § 1915(b)(1) and (2).  The court severed and dismissed the Fifth and Fourteenth Amendment procedural
due process claims asserted against Lieutenants Rivera and Prior, Officers Gonzalez and Mathews, Warden
Mulligan and District Administrator Quiros and the Eighth Amendment conditions of confinement claims asserted
against Officer Musshorn without prejudice pursuant to Rules 20 and 21, Fed. R. Civ. P.  *See* ECF No. 7 at 20.

All defendants now move for summary judgment, which Papantoniou opposes.  For the reasons set forth below, the motion is granted.

**Standard of Review**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Which facts are material is determined by the substantive law.  *Anderson*, 477 U.S. at 248.  "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense. . . ."  *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine dispute as to any issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (internal quotation marks and citation omitted).  To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his

2

favor.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts[2]**

Kevin McCrystal is a Physician Assistant who worked at MacDougall-Walker Correctional Institution from 2004 until August 1, 2018.  Defs.' L.R. 56(a)1 ¶¶ 1, 48.  PA McCrystal diagnosed and treated patients, prescribed medications, and submitted requests to the Utilization Review Committee ("URC") for approval of referrals of inmates to medical providers outside of the Department of Correction.  *Id.* ¶ 2.

Dr. Naqvi is a medical doctor employed by the Connecticut Department of Correction, is licensed to practice medicine in Connecticut, and is trained as an ear, nose, and throat ("ENT") specialist.  *Id.* ¶¶ 49, 55.  Dr. Naqvi's responsibilities include providing medical care to inmates at MacDougall-Walker.  *Id.* ¶ 50.

On June 2, 2016, Papantoniou became a sentenced prisoner.  On July 26, 2016, he was transferred to MacDougall-Walker.  *Id.* ¶ 52.  Prior to September 19, 2016, Papantoniou

---

[2]   The facts are taken from the Defendants' Local Rule 56(a) Statement ("Defs.' L.R. 56(a)1"), [ECF No. 27-2]; Exhibits A through M, [ECF. Nos. 27-4 to 27-14, 28, and 29], filed in support of the Local Rule 56(a)1 Statement; Papantoniou's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2"), [ECF No. 35] at 41-73; the Exhibits filed in support of the Statement, [ECF No. 35] at 82-117; Papantoniou's Declaration, [ECF No. 35] at 27-40]; and the verified Complaint, [ECF No. 1].  *See Curtis v. Cenlar* FSB, 654 F. App'x 17, 20 (2d Cir. 2016) (summary order) ("Though we may treat [plaintiff's] verified complaint 'as an affidavit for summary judgment purposes,' the allegations contained therein can suffice to defeat summary judgment only insofar as they were made on personal knowledge.") (quoting *Conlon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

3

experienced pain and soreness in his lower spine.  Compl., ECF No. 1, ¶ 21.  On September 19, 2016, he experienced painful spasms in the right side of his back that traveled down his right leg. *Id.* ¶ 21.  These spasms incapacitated Panatoniou for two weeks.  *Id.* ¶¶ 26-27.  On October 9, 2016, a medical provider cleared Papantoniou to perform a kitchen job, Defs.' L.R. 56(a)1 ¶ 13, where his duties included washing food service trays, sweeping, mopping, and cooking.  Pl.'s L.R. 56(a)2 ¶ 13.

On November 4, 2016, Papantoniou submitted an inmate request form to the medical department that was addressed to PA McCrystal in which he indicated that during the two-year period preceding the filing of the inmate request, medical staff members had assessed him three times for an injury to his back and had prescribed ibuprofen to alleviate the pain caused by his back injury.  *Id.*  He also stated that he believed long term relief from the pain was necessary and requested to be placed in the Wellness Program at MacDougall-Walker.  *Id.*  The Wellness Program was not a form of treatment but did provide inmates with the opportunity to exercise and learn more about staying healthy.  *Id.* ¶ 10.  PA McCrystal was responsible for assessing inmates to determine whether there were any medical contraindications that would preclude them from participating fully in the Wellness Program.  *Id.* ¶ 11.  On November 14, 2016, PA McCrystal informed Papantoniou that he was on the waiting list for the Program.  *Id.*; Ex. L at 3, ECF No. 27-14.

On July 5, 2017, Papantoniou submitted an inmate request form to the medical department seeking to be seen by a medical provider because his back was "really messed up" and his mattress, which had holes in it, made his back worse.  *Id.* ¶ 14.  On July 9, 2017, a nurse assessed Papantoniou's back, noted that Papantoniou suffered from intermittent back spasms,

and referred Papantoniou to be seen at MD sick call.  *Id.* ¶ 15.

On July 16, 2017, a nurse assessed Papantoniou for complaints of a hoarse throat and lower back pain and back spasms.  *Id.* ¶ 16; Ex. B at 20-21, ECF No. 28.  She prescribed pain medication and ordered that Papantoniou undergo x-rays of his back.  *Id.*

Dr. Naqvi examined and treated Papantoniou on July 26, 2017.  *Id.* ¶¶ 53-54.  During that appointment, Papantoniou complained of hoarseness in his throat.  *Id.* ¶ 54.  Dr. Naqvi assessed Papantoniou, diagnosed him as suffering from laryngopharyngitis, prescribed medication to treat the condition, and recommended that a request be submitted to the URC for approval of a consultation with an outside ENT.  *Id.* ¶ 56; Ex. B at 22 , ECF No. 28.  Dr. Naqvi examined Papantoniou for the sole purpose of determining whether to refer Papantoniou to an outside ENT.  *Id.* ¶ 57.  Dr. Naqvi did not provide day-to-day care to Papantoniou.  *Id.* ¶ 58.  PA McCrystal was assigned to provide ongoing and daily care to Papantoniou.  *Id.* ¶ 59.  Other than this one appointment and referral for ENT consultation, Dr. Naqvi did not see or treat Papantoniou.  *Id.* ¶ 59.

On July 27, 2017, Papantoniou underwent x-rays of his lumbar spine.  *Id.* ¶ 17; Ex. B at 8, ECF No. 28.  The x-rays showed no evidence of a fracture or bony destructive process, mild disc space narrowing at L4-L5, marked disc space narrowing at L5-S1, and degenerative changes in facet joints L3-L4, L4-L5, L5-S1.  *Id.*

On August 6, 2017, a nurse assessed Papantoniou due to complaints of pain and intermittent spasms in his back.  *Id.* ¶ 18.  On August 22, 2017, a medical staff member entered an order for ibuprofen.  *Id.* ¶ 19.  On September 4, 2017, a nurse assessed Papantoniou due to his complaints of lower back spasms and the failure of ibuprofen to alleviate the spasms.  Pl.'s L.R.

56(a)2 ¶ 20; Defs.' L.R. 56(a)1, Ex. B at 15-16, ECF No. 28.  Papantoniou stated that his pain level was 4 out of 10 and that the spasms were intermittent.  *Id.*  The nurse observed that Papantoniou could ambulate independently, had undergone back x-rays, and had been prescribed ibuprofen for pain.  *Id.*  She instructed Papantoniou to do exercises to strengthen his back and reduce the pain and placed him on the provider sick call list.  *Id.*

On October 10, 2017, PA McCrystal called Papantoniou to the medical department, reviewed the x-rays of Papantoniou's lumber spine with Papantoniou, and observed that Papantoniou had been cleared for kitchen work even though he reported chronic pain in his back. Defs.' L.R. 56(a)1 ¶¶ 21-22.  PA McCrystal prescribed a medication to alleviate muscle pain and a back binder, re-instructed Papantoniou on how to perform back exercises, and recommended that Papantoniou find a job that was less strenuous and required less lifting.  *Id.*  On October 23, 2017, a nurse assessed Papantoniou in response to his complaints of chronic back issues.  Pl.'s L.R. 56(a)2 ¶ 20; Defs.' L.R. 56(a)1, Ex. B at 13-14, ECF No. 28.  The nurse noted that x-rays of Papantoniou's lumbar spine on July 27, 2017 showed arthritis and that Papantoniou reported that he worked in the kitchen, wore a back binder for support, suffered from chronic back pain, and experienced some relief from performing back exercises.  *Id.*  Papantoniou asked the nurse for a muscle relaxant.  *Id.*  The nurse requested that a physician or physician assistant review Papantoniou's medical records.  *Id.*

On January 11, 2018, PA McCrystal evaluated Papantoniou in response to his complaints of back spasms.  Defs.' L.R. 56(a)1 ¶ 28.  McCrystal assessed Papantoniou's spinous process and noted that there was no pain.  *Id.*  McCrystal prescribed baclofen to treat Papantoniou's back spasms.  *Id.* ¶ 29.  McCrystal also ordered another set of x-rays of Papantoniou's lumbar spine.

*Id.* ¶ 30.

On March 28, 2018, PA McCrystal submitted a request to the URC for approval of a procedure involving the injection of a steroid into Papantoniou's spine. *Id.* 31.  During the procedure, x-rays are used to guide the needle to the appropriate location to inject the steroid. *Id.* On April 5, 2018, the URC denied the request. *Id.* ¶ 32.  McCrystal did not have the authority to overrule this decision by the URC. *Id.* ¶ 35.

On April 2, 2018, Papantoniou underwent x-rays of his lumbar spine. *Id.* ¶ 30; Ex. B at 7, ECF No. 28.  The x-rays showed no evidence of a fracture or bony destructive process, mild disc space narrowing at L4-L5 and marked disc space narrowing at L5-S1, and degenerative changes in facet joints L3-L4, L4-L5, L5-S1. *Id.*

There is no cure for arthritis. *Id.* ¶ 37.  Pain management is the first step in alleviating arthritis and intermittent back pain. *Id.* ¶ 38.  After pain management is no longer effective, more invasive measures may be undertaken to alleviate intermittent back pain. *Id.*

PA McCrystal reviewed the x-rays taken of Papantoniou's lumbar spine and observed that the x-rays showed mild degeneration and were otherwise unremarkable. *Id.* ¶ 40.  In the absence of any effect of the degeneration of Papantoniou's spine on his activities of daily living, the appropriate course of treatment was to prescribe medication to address pain and stretching exercises to maximize flexibility and to minimize pain. *Id.* ¶ 41.

On April 17, 2018, Correctional Officer Russell was working the first shift as a J Unit Control Officer and Lieutenant Jasmin was working the first shift as the North Sector Supervisor. *Id.* ¶ 70-71; Jasmin Decl. ¶¶ 4-5, Ex. D, ECF No. 27-6.  At some point during that shift, Papantoniou experienced a back spasm as he climbed down from the bunk in his cell, lost his

footing, and fell to the floor.  Papantoniou Decl. ¶ 3, ECF No. 53 at 33.  During Correctional

Officer Russell's tour of the unit, he stopped at Papantoniou's cell and Papantoniou stated that he

needed to be seen by a medical provider due to ongoing issues with his back.  Defs.' L.R. 56(a)1

¶¶ 72-73.  Officer Russell contacted the medical department and related Papantoniou's request to

be seen by a medical provider due to an issue with his back.  *Id.* ¶¶ 74, 77.  A staff member in the

medical department determined that Papantoniou would not be seen until second shift.  *Id.*

Officer Russell passed on this information to Papantoniou.  *Id.* ¶¶ 78.  Officer Russell was not a

medical provider, did not have the training to render medical assistance to inmates, and had no

authority over staff members in the medical department.  *Id.* ¶ 75-76.

Once Papantoniou's cell door opened to permit him to go to recreation, Papantoniou,

with the assistance of his cellmate, walked down the stairs to the lower tier to speak to Officer

Russell.  *Id.* ¶ 82; Papantoniou Decl. ¶ 15; Ex. M, Holmes Aff., ECF No 35 at 34-35, 93.  After

he reached the bottom of the stairs, Papantoniou walked to the officer's station, sat on the floor,

and asked Officer Russell to call a captain or a lieutenant.  *Id.*  Officer Russell ordered

Papantoniou to return to his cell and to wait for a medical provider to arrive.  Defs.' L.R. 56(a)1

¶ 88.

After Lieutenant Jasmin arrived in J-Unit, he ordered the inmates who were engaged in

recreational activities to return to their cells.  *Id.* ¶¶ 91-93.  He then spoke to Papantoniou.  *Id.*  In

response to Lieutenant Jasmin's questions, Papantoniou stated that he needed to be seen by a

medical provider.  *Id.* ¶ 94.  Lieutenant Jasmin informed Papantoniou that a staff member in the

medical department had indicated that someone would speak to him and assess his injury during

second shift.  *Id.* ¶ 95.  When it became clear that Papantoniou would not return to his cell,

8

Lieutenant Jasmin requested that an officer bring a wheelchair to the unit and wheel Papantoniou to the restrictive housing unit. *Id.* ¶ 104. A medical provider assessed Papantoniou for placement in the restrictive housing unit and advised Lieutenant Jasmin that Papantoniou would be seen and evaluated for his back pain during second shift. *Id.* ¶¶ 105-06.

Rikel Lightner ("Lightner") served as the Health Services Administrator at MacDougall-Walker during the period of 2013 until May 2018. *Id.* ¶¶ 61, 69. As a health services administrator, Lightner did not practice medicine or treat patients; have the authority to order or authorize surgical procedures or surgical consultations for inmates, order or dictate medical decisions or medical care by other providers; or serve on or oversee the URC. *Id.* ¶ 62-64. Lightner's duties as a health services administrator at MacDougall-Walker included overseeing inmate access to medical appointments, sick call, or other appointments. *Id.* ¶ 65. She had no authority to dictate what treatment would be provided by any medical provider to any inmate. *Id.* Lightner never held the title or position of Director of Health Services at MacDougall-Walker or for the University of Connecticut Correctional Managed Healthcare Unit. *Id.* ¶ 66.

In May 2018, Lightner ended her tenure as Health Services Administrator at MacDougall-Walker. *Id.* ¶ 69. On August 1, 2018, prison officials reassigned PA McCrystal to Hartford Correctional Center. *Id.* ¶ 48.

**Discussion**

All defendants assert that Papantoniou failed to exhaust his administrative remedies before bringing these claims and that they were not deliberately indifferent to Papantoniou's serious medical needs. Alternatively, they assert that they are entitled to qualified immunity.

### Exhaustion of Administrative Remedies

9

The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies before filing a federal lawsuit relating to prison conditions.  *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  This exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002).

Exhaustion of all available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-91, 93 (2006) (proper exhaustion "means using all steps that the agency holds out ... (so that the agency addresses the issues on the merits) ... [and] demands compliance with agency deadlines and other critical procedural rules").  An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross v. Blake*, ___ U.S.___, 136 S. Ct. 1850, 1858 (2016).  The Supreme Court described three situations in which official prison administrative remedies might be unavailable because the procedures could not be used by an inmate to obtain relief for the conduct or conditions complained about. *Id.* 1859-60. First, an administrative remedy may be unavailable when "it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859.  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use" because an "ordinary prisoner can[not] discern or navigate it" or

"make sense of what it demands." *Id.* (citations omitted).  Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Exhaustion of administrative remedies is an affirmative defense on which the defendants bear the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). If the defendants establish that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must demonstrate that the administrative remedy procedures were not available to him under *Ross*. *See id.*

There is no dispute that claims related to deliberate indifference to an inmate's health or safety by a correctional officer are subject to the Inmate Grievance Procedure set forth in Administrative Directive 9.6(6) and claims related to deliberate indifference to an inmate's medical needs by a medical provider or health services administrator, are subject to the Administrative Remedy for Health Care procedure set forth in Administrative Directive 8.9. *Id.* Papantoniou does not dispute that he was familiar with these administrative remedies during the relevant period. *See* Compl. at 35; Mem. Opp'n Mot. Summ. J., ECF No. 35, at 1-11.

**Administrative Directive 9.6 – Claims Against Jasmin and Russell**

Administrative Directive 9.6(6) requires that an inmate must first attempt to resolve the claim or issue informally.  He or she may attempt to verbally resolve the issue with an appropriate staff member or supervisor. *Id.* at 9.6(6)(A).  If attempts to resolve the matter orally are not effective, the inmate must make a written attempt using Inmate Request Form, CN 9601, and send that Form to the appropriate staff member. *Id.*  If the inmate does not receive a response to the written request within fifteen business days or the inmate is not satisfied with the

response to his or her request, he or she may file a Level 1 grievance using Inmate Administrative Remedy Form, CN 9602. *Id.* at 9.6(6)(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the Inmate Request Form or explain why the response is not attached. *Id.* The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. *Id.* at 9.6(6)(I).

The inmate may appeal the Unit Administrator's disposition of the grievance or the Unit Administrator's failure to dispose of the grievance in a timely manner to Level 2. *Id.* at 9.6(6)(G), (I) & (K). The Level 2 appeal of a disposition of a Level 1 grievance must be filed within five calendar days from the inmate's receipt of the decision disposing of the Level 1 grievance. *Id.* at 9.6(K). A Level 2 appeal of the Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within 65 days from the date the Level 1 grievance was filed by the inmate. *Id.* at 9.6(M).

A District Administrator is responsible for reviewing Level 2 appeals. *Id.* at 9.6(6)(K). A response to the Level 2 appeal must be issued within thirty business days of receipt of the appeal. *Id.*

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure and level 2 appeals to which there has been an untimely response by the District Administrator. *Id.* at 9.6(6)(L). A Level 3 appeal must be filed within five calendar days from the inmate's receipt of the decision disposing of the Level 2 appeal. *Id.* A Level 3 appeal of the District Administrator's failure to dispose of the Level 2 appeal in a timely manner

must be filed within 35 days of the date the Level 2 appeal was filed by the inmate.  *Id.* at

9.6(6)(M).  The Commissioner of Correction or his or her designee is responsible for reviewing

Level 3 appeals.  *Id.* at 9.6(6)(L).  A response to a Level 3 appeal must be issued within thirty

business of receipt of the appeal.  *Id.*

Defendants Jasmin and Russell argue that Papantoniou made no attempt to exhaust his

available administrative remedies under Administrative Directive 9.6 as to his claim that on

April 17, 2018, they were deliberately indifferent to his need for medical treatment for his

painful back.  In support of this argument, Defendants have submitted the Declaration of

Administrative Remedies Coordinator Jessica Bennett ("Bennett").  *See* Defs.' L.R. 56(a)1, ECF

No. 27-9, Ex. G. Bennett reviewed the Grievance Log from the date of April 17, 2018 to May 18,

2018 and found only one grievance appeal filed by Papantoniou on May 30, 2018 which related

to a disciplinary report.  Bennett Decl. ¶¶ 10-12; Ex. G, ECF No. 27-9.  Indeed, Papantoniou

concedes that he did not file a grievance regarding the alleged deliberate indifference by Officer

Russell and Lieutenant Jasmin to his need for medical treatment on April 17, 2018.  He contends

however that since he is suing both defendants in their individual capacities only, he was not

required to exhaust his administrative remedies. He cites no authority for this novel proposition

and his argument is misplaced.

First, the complaint reflects that Papantoniou sues both Jasmin and Russell in their

individual and official capacities and seeks injunctive relief from both defendants in addition to

monetary damages.  *See* ECF No. 1 at 5-6, 36-37.  Regardless the capacity in which the

defendants are sued however, the Supreme Court has held that an inmate must exhaust all

available remedies prior to filing a lawsuit in federal court challenging the actions or failure to

act by prison officials.  There is no exception to the exhaustion requirement based upon the relief sought or the capacity in which a prison official is sued.  *See* Porter, 534 U.S. at 524 ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'") (quoting 42 U.S.C. § 1997e(a) and *Booth*, 532 U.S. at 739, 740 & n.5 ("Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures.") (citations omitted)). The court concludes that Defendants Jasmin and Russell have met their burden of demonstrating that there is no genuine issue of material fact as to whether Papantoniou exhausted his available administrative remedies with respect to the claims asserted in this case. He did not. The motion for summary judgment is granted as to defendants Jasmin and Russell.

### Administrative Directive 8.9 – Claims Against Lightner, Naqvi, McCrystal

Administrative Directive 8.9 provides Health Services Review procedures to address two types of issues or claims related to the medical, dental, or mental health care of an inmate: (1) Diagnosis and Treatment issues and (2) Administrative health care issues involving a procedure, practice, policy, or the improper conduct of a health services provider.  *See* Administrative Directive 8.9(9)(A) & (B).

An inmate seeking review of an issue involving a diagnosis or treatment or an administrative health care issue involving a procedure, practice, policy, or the improper conduct of a health services provider must first attempt to seek informal resolution either by speaking to the appropriate staff member or by sending a written request to a supervisor.  *Id.* at 8.9(10). The supervisor must respond to a written attempt at informal resolution within fifteen calendar days of receipt of the request.  *Id.*  If the informal resolution of the inmate's issue is

14

unsatisfactory or unsuccessful, the inmate may apply for a Health Services Review using the

Inmate Administrative Remedy Form, CN 9602, and checking off either the

Diagnosis/Treatment box or the All Other Health Care Issues box for an administrative issue.

*Id.* at 8.9(11) & (12).

If the inmate seeks review of a diagnosis or the treatment or lack of treatment of a

medical, dental, or mental health condition, the Health Services Review Coordinator is required

to schedule a Health Services Review Appointment with a physician, dentist, psychologist,

psychiatrist, or advanced practice registered nurse ("APRN"), as appropriate, as soon as

possible. *Id.* at 8.9(11)(A). If, after the appointment, the physician, dentist, psychologist,

psychiatrist or APRN concludes that the existing diagnosis or treatment is appropriate, the

inmate is deemed to have exhausted his or her health services review remedy. *Id.* If the

physician, dentist, psychologist, psychiatrist or APRN reaches a different conclusion with regard

to the appropriate diagnosis or course of treatment for the inmate's condition, he or she may

either provide the appropriate diagnosis or treatment or refer the case to the URC for

authorization indicating the need for different treatment. *Id.* at 8.9(11)(B).

If the inmate seeks review of an administrative health care issue, the health services

coordinator is required to evaluate, investigate, and decide the matter within thirty

days. *Id.* at 8.9(12)(A). If the inmate is not satisfied with the response to his or her request for

review, he or she may appeal the decision within ten business days of receiving the

decision. *Id.* at 8.9(12)(B). The health services provider or the designated facility health services

director must decide the appeal "within fifteen business days of receiving the appeal." *Id.* at

8.9(12)(C). If the issue being raised "relates to a health services policy of the Department, the

15

inmate may appeal to the DOC Director of Health Services within ten business days of"
receiving the decision from the health services provider or designated facility health services
director. *Id.* at 8.9(12)(D).

Papantoniou, Naqvi, McCrystal, and Lightner agree that during Papantoniou's
confinement at MacDougall-Walker from July 2016 to December 2019, he submitted a request
for Health Services Review on May 22, 2018 in which he asserted that he had not received
treatment for chronic back pain.  They further agree that Papntoniou submitted a request for
Health Services Review on July 11, 2019 in which he asserted that he had not received a
response to a request for Health Services Review which he had previously submitted.  *See* Defs.'
L.R. 56(a)1 ¶¶ 129-35; Walker Decl. ¶¶ 8-15; Ex. F, ECF No. 27-8; Pl.'s L.R. 56(a)2 ¶¶ 129-35.
These are the only requests for Health Services Review that are on file as having been submitted
by Papantoniou and received by the health services review coordinator at MacDougall-Walker.
*Id.*

### Health Services Administrator Lightner

The only allegations against Lightner are that she failed to respond to a written request
regarding the results of the July 2017 x-rays which was sent by Papantoniou on an unspecified
date between August 28, 2017 and October 10, 2017, and that she failed to respond to a letter,
pertaining to medical treatment, sent by Papantoniou at some unspecified time after he returned
to general population on August 16, 2018.  Compl., ECF No. 1, at 13, 29-30, ¶¶ 34, 101, 103; at
70-73, Ex. WW.

Lightner argues that Papantoniou did not exhaust his available health service remedies as
to either claim because neither the May 2018, nor the July 2019 requests for Health Services

Review include Lightner's name or make any mention of the request sent to her in 2017 or the letter sent to her after August 16, 2018. Nor do they include any allegation that any medical official failed to respond to prior correspondence. Papantoniou does not dispute these facts. Nor does he dispute that to exhaust his administrative remedies with respect to Lightner's conduct, he would need to have filed a request for review of an administrative health care issue involving a procedure, practice, policy, or the improper conduct of a health services provider under Administrative Directive 8.9(12)(A) – (D). And Papantoniou acknowledges that he did not file such a request with respect to Lightner's conduct. *See* Defs.' L.R. 56(a)1 ¶¶ 67, 133-35; Pl.'s L.R. 56(a)2 ¶¶ 67, 133-35.

Accordingly, Defendant Lightner has met her burden of demonstrating that there is no genuine issue of fact as to whether Papantoniou exhausted his administrative remedies with respect to the claims against her. He did not. The motion for summary judgment is granted as to Defendant Lightner.

### Dr. Naqvi and PA McCrystal

Defendants Naqvi and McCrystal argue that the May 2018 request for Health Services Review did not constitute proper exhaustion of available administrative remedies under Administrative Directive 8.9 because it failed to put them on notice of how their conduct was deficient. The May 2018 request for Health Services Review included allegations that Papantoniou had suffered from an injury to his back for three years, the injury caused him chronic pain and occasionally incapacitated him, he had sent requests for treatment of the injury to the medical department at MacDougall-Walker over a two-year period, the responses to the requests were illegible, and a physician had not examined him or diagnosed the cause of his

injury.  *See* Defs.' L.R. 56(a)1 ¶ 130; Ex. N at 5-6, ECF No. 29.  For relief, Papantoniou sought

an examination by a qualified physician who could render a diagnosis and prescribe treatment for

his injury.  *Id.*  Neither Dr. Naqvi, nor PA McCrystal are specifically mentioned in the request

for Health Services Review.  *Id.*

The Supreme Court has observed that "[t]he PLRA's exhaustion requirement is designed

to "afford[ ] corrections officials time and opportunity to address complaints internally before

allowing the initiation of a federal case." *Porter*, 534 U.S. at 524-25; *see also Jones*, 549 U.S. at

217–19 ("We have identified the benefits of exhaustion to include allowing a prison to address

complaints about the program it administers before being subjected to suit, reducing litigation to

the extent complaints are satisfactorily resolved, and improving litigation that does occur by

leading to the preparation of a useful record.")  (citing *Woodford,* 548 U.S. at 88-91)).  To meet

this objective, "inmates must provide enough information [in a prison grievance] about the

conduct of which they complain to allow prison officials to take appropriate responsive

measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004); *see also Edwards v.

Melendez*, 832 F. App'x 50, 53–54 (2d Cir. 2020) (summary order) ("Although a plaintiff need

not specifically articulate his claims in grievances in the exact same manner that he articulates

them in federal court, he is required to give notice to the defendants about the factual basis of his

claims.") (citations omitted).  However, the inmate filing the grievance "need not lay out the

facts, articulate legal theories, or demand particular relief.  All the grievance need do is object

intelligibly to some asserted shortcoming." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006)

(internal quotation marks and citation omitted).  Furthermore, "exhaustion is not *per

se* inadequate simply because an individual later sued was not named in the grievances." *Jones*,

18

549 U.S. at 219.

Papantoniou acknowledges that he did not mention Dr. Naqvi or PA McCrystal in the May 2018 request for Health Services Review. But he contends that he included a description of informal inmate requests that he had submitted to the medical department prior to filing the request for Health Services Review and that those informal requests referenced both Dr. Naqvi and PA McCrystal by name.  Defendants respond that those informal requests were not identified by date and were not attached to the May 2018 request for Health Services Review.  *See* Defs.' L.R. 56(a)1 ¶ 130; Ex. N at 6.  Thus, the reference to inmate requests would not necessarily have put Dr. Naqvi or PA McCrystal on notice that the request for Health Services Review was directed towards their alleged lack of treatment for his back pain.  Papantoniou contends further that from September 2016 to May 2018, Dr. Naqvi and PA McCrystal were the only staff members in the medical department at MacDougall-Walker who were assigned to provide him with treatment.  Thus, they had to have known that the May 2018 request for Health Services Review was addressed to their lack of treatment or the provision of inadequate treatment for his back pain and spasms.

The court concludes that there is a genuine issue of material fact as to whether the May 22, 2018 request for Health Services Review was sufficient to put Dr. Naqvi and/or PA McCrystal on notice of the claims against them and therefore whether Papantoniou exhausted his administrative remedies. *See, Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ("The grievance alleged that Green Haven's Medical Department, its medical personnel, and prison officials refused to allow Espinal to attend his scheduled medical appointments. This was a sufficient description of the alleged wrong. The State's assertion that the grievance "failed to

provide prison officials with sufficient notice of wrongdoing to cause them to investigate any

such claim" cannot be squared with the" fact that the information in the grievance "enabled the

State to investigate Espinal's claim that he was denied access to medical care.").

**Eighth Amendment Deliberate Indifference**

Dr. Naqvi and PA McCrystal argue that even if there is a question of fact as to whether

he exhausted his remedies, or even if he is deemed to have exhausted his remedies, Papantoniou

cannot establish that either defendant was deliberately indifferent to his back condition during

his confinement at MacDougall-Walker. Papantoniou responds that he has asserted sufficient

facts to demonstrate that he suffered from a painful back injury and that the defendants delayed

or denied him treatment for this serious injury.

The Eighth Amendment prohibits "deliberate indifference to an inmate's serious medical

needs." *Estelle v Gamble*, 429 U.S. 97, 104 (1976).  An inmate must meet two elements to state

a claim that a medical provider was deliberately indifferent to his medical needs.  The first

element requires the inmate to demonstrate that his medical need or condition is objectively

serious. *Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need

contemplates "a condition of urgency" such as "one that may produce death, degeneration, or

extreme pain") (internal quotation marks and citation omitted).  In determining whether a

condition is serious, the court considers whether "a reasonable doctor or patient would find [it]

important and worthy of comment," whether the condition "significantly affects an individual's

daily activities," and whether it causes "chronic and substantial pain."  *Chance v. Armstrong*, 143

F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

To meet the second element, the inmate must allege that the medical provider "act[ed]

with a sufficiently culpable state of mind." *Hill*, 657 F.3d at 122 (citation omitted).  This state of mind may be shown if the medical provider was aware that his actions or inactions would cause a substantial risk of serious harm.  *Id.* ("[T]he official must "'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).  Mere negligent conduct or malpractice, however, does not constitute deliberate indifference.  *See Hill*, 657 F.3d at 123 ("'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'") (quoting *Estelle*, 429 U.S. at 106); *Chance*, 143 F.3d at 703 ("Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.") (citation omitted).

Defendants Naqvi and McCrystal do not argue that the Plaintiff's back condition was not sufficiently serious. Rather, the defendants contend that the record evidence does not reflect deliberate indifference to his complaints of back pain and spasms.  Accordingly, the court assumes for purposes of this ruling that Papantoniou's back condition constituted a serious medical condition as to implicate the Eighth Amendment.

**Dr. Naqvi**

The medical records submitted by Dr. Naqvi as well as by Papantoniou include entries as to an appointment on July 26, 2017, during which Dr. Naqvi assessed Papantoniou's symptoms of hoarseness in his throat.  Ex. B, ECF No. 28; Exs., ECF No. 35 at 82-117.  Dr. Naqvi, who trained as an ear, nose, and throat specialist, examined Papantoniou on July 26, 2017 for the sole

purpose of diagnosing the cause of the hoarseness in his throat and to determine whether a referral to an outside ENT was necessary.  Naqvi Decl. ¶¶ 9-10, Ex E, ECF No. 27-7.  After assessing Papantoniou's symptoms, Dr. Naqvi prescribed medication and recommended that a request be submitted to the URC for approval of a consultation with an ear, nose, and throat specialist.  *Id.* ¶ 11.  Dr. Naqvi did not provide day-to-day care for Papantoniou.  *Id.* ¶ 13.  Rather, PA McCrystal was assigned as Papantoniou's day to day treatment provider.  *Id.* ¶ 14.  Other than this one appointment, Dr. Naqvi declares that he did not see Papantoniou regarding any other medical issues.  *Id.* ¶ 15.

Papantoniou declares that he discussed the pain in his back at the appointment on July 26, 2017 and that Dr. Naqvi responded that the pain was "due to old age" and that everyone "goes through it."  Papantoniou Decl. ¶ 11, ECF No. 35 at 32.  In his memorandum in opposition to the motion for summary judgment, Papantoniou contends that in connection with the July 26, 2017 appointment, Dr. Naqvi entered an order that he undergo x-rays of his lumbar spine and that he underwent x-rays on July 27, 2017.  However, Papantoniou's medical records do not contain an order for x-rays entered by Dr. Naqvi on July 26, 2017 or on any other date.  *See* Ex B, ECF No. 28 at 5, 22.  In support of his contention, Papantoniou relies on a report documenting the July 27, 2017 x-rays, which identifies Dr. Naqvi as the attending physician.  *Id.* at 8.  However, the report also identifies the referring medical provider as APRN LaFrance, and a medical record documenting an appointment with a nurse on July 16, 2017, reflects that Papantoniou complained of back pain and that the nurse referred Papantoniou for x-rays.  *Id.* at 20-21.  The medical records reflect further that it was PA McCrystal who reviewed the July 27, 2017 x-ray results with Papantoniou on October 10, 2017 and prescribed treatment for the spasms in

Papantoniou's back.  *Id.* at 4, 19.  Papantoniou also relies upon the fact that the report documenting the April 2018 x-ray also identified Dr. Naqvi as the attending physician and the referring medical provider.

However, the mere fact that Dr. Naqvi's name appears in these various records, does not demonstrate that he was deliberately indifferent to Papantoniou's complaints of back pain or even raise a genuine issue of material fact on the issue. *Id.* at 7.  Indeed, PA McChrystal declares that to further monitor Papantoniou condition and to determine the cause of his complaints of back pain and spasms, after his appointment with Papantoniou on January 11, 2018, it was he who recommended or arranged for Papantoniou to undergo x-rays.  McCrystal Decl. ¶ 38, ECF No. 27-4.

It is evident from Dr. Naqvi's Declaration and the medical records submitted by the parties that PA McCrystal was responsible for the day-to-day treatment of Papantoniou's medical conditions, including his back pain and spasms, from September 2016 until August 1, 2018, when McCrystal was reassigned to Hartford Correctional Center.[3]

Papantoniou has offered no evidence that Dr. Naqvi was directly involved in examining or assessing him or the decisions regarding diagnostic testing and treatment for his back condition. Nor has he demonstrated that he addressed any requests for treatment directly to Dr. Naqvi through the production of any such requests. Thus, Dr. Naqvi has established that there is

---

[3] Papantoniou alleges that after McCrystal left MacDougall-Walker, a different medical provider, APRN McPhearson, took over his day-to-day care and treatment.  Papantoniou Decl. ¶ 21, ECF No. 35 at 37.  McPhearson met with and examined Papantoniou in response to his complaints of back pain, prescribed him treatment, and sought and received approval from the URC to send him to the University of Connecticut Health Center for an MRI of his spine.  *Id.*; Compl. ¶¶ 107-12, 120-21, Exs. BB, EE, FF, GG, II.  Papantoniou underwent an MRI of his spine in April 2019.  *See* Ex. II, ECF No 53 at 82.

no genuine issue of material fact as to whether Dr. Naqvi was actually aware of and deliberately indifferent to Papantoniou's medical needs.  He was not. The motion for summary judgment is granted as to Dr. Naqvi.

**PA McCrystal**

PA McCrystal argues that the Papantoniou's medical records accurately reflect that during the period from September 2016 to August 2018, he and other medical providers at MacDougall-Walker consistently addressed and provided treatment for Papantoniou's complaints of back pain and spasms.  McCrystal states that the x-rays taken of Papantoniou's lumbar spine showed mild degeneration and that there was no objective evidence that this degree of degeneration impacted Papantoniou's activities of daily living.  McCrystal Decl. ¶ 49, ECF No. 27-4; Ex. B at 7-8, ECF No. 28.  In choosing the appropriate course of treatment for an individual like Papantoniou who exhibited mild degeneration of the spine, PA McCrystal prescribed medication to address the pain and stretching exercises to maximize flexibility and to minimize the pain.  *Id.* ¶ 50; Ex. B at 4, 19, ECF No. 28.  Papantoniou's medical records reflect that McCrystal met with and listened to Papantoniou's complaints about pain and spasms in his lower back, examined him, recommended that he engage in a prison job that would not aggravate or exacerbate the pain in his back, referred him for diagnostic x-rays, and prescribed various medications, exercises, and a back binder to alleviate Papantoniou's back spasms and pain.  Ex. B at 4-5, 7-8, 19.  When the medication and exercises had become ineffective in alleviating Papantoniou's back pain and spasms, PA McCrystal considered another treatment option in the form of steroid injections, and on March 28, 2018, PA McCrystal referred a request to the URC for approval of this treatment recommendation.  McCrystal Decl. ¶¶ 51-53.  The URC

subsequently denied McCrystal's request.  *Id.* ¶ 54.  He had no authority, however, to override that decision.

While Papantoniou is clearly dissatisfied with his treatment options and the treatment he received, the record makes manifest that McCrystal did not ignore, or refuse or fail to treat Papantoniou's back condition.  Rather, the record evidence demonstrates that McCrystal, together with other nurses at MacDougall-Walker, were responsive to his complaints of pain and discomfort and attempted to treat and alleviate his painful conditions.  The fact that Papantoniou disagrees with the type of medications prescribed by PA McCrystal to treat the pain and spasms and believes that PA McCrystal should have should have referred him for an MRI of his spine in 2017 or 2018, does not demonstrate that PA McCrystal's decisions regarding treatment and testing constituted deliberate indifference to his medical needs.  *See, e.g.*, *Nelson v. Deming*, 140 F. Supp. 3d 248, 262 (W.D.N.Y. 2015) (dismissing deliberate indifference claim because the "[p]laintiff's disagreement with th[e] course of treatment does not amount to deliberate indifference by [the] [d]efendants"); *Williams v. Williams*, No. 13-CV-3154, 2015 WL 568842, at *5 (S.D.N.Y. Feb. 11, 2015) ("[C]ourts have repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's medical needs" when a plaintiff challenges "the type and quantity of pain medication.") (collecting cases); *Smith v. Wilson,* No. 12-CV-1152, 2013 WL 5466857, at *9 (N.D.N.Y. Sept. 30, 2013) ("The fact that [the] [d]efendant ... reached a different conclusion than ... any of [the] [p]laintiff's other doctor[s], is not actionable where ... [the] [d]efendant['s] ... determination was based on reasonable medical judgment.") (citing *Ravenell v. Van der Steeg,* No. 05 CIV 4042 WHP, 2007 WL 765716, at *6–7 (S.D.N.Y. Mar.14, 2007) (collecting cases); *Cerilli v. Rell*, No. 3:08CV242 SRU, 2010 WL 3827960, at

*12 (D. Conn. Sept. 23, 2010) ("Although . . . a different dentist recommended a new set of dentures because the old set was "non-salvageable," that mere inconsistency of medical opinion—especially when that inconsistency reflects opinions separated by two years in time—is insufficient to sustain a deliberate indifference claim."); *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") (citing *Estelle*, 429 U.S. at 107).

Accordingly, the motion for summary judgment is granted as to PA McCrystal.

**Conclusion**

The Motion for Summary Judgment [**ECF No. 27**], is **GRANTED**.  The Clerk is directed to enter judgment for the defendants and to close this case.

SO ORDERED at Bridgeport, Connecticut this 16th day of September 2021.

___/s/_____
Kari A. Dooley
United States District Judge

26